# In the United States Court of Federal Claims

No. 18-1864C
Filed: January 8, 2020
NOT FOR PUBLICATION

| | |
|---|---|
| CREATIVE MANAGEMENT SERVICES, LLC, D/B/A MC² | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

Contract Disputes Act; 41 U.S.C. §§ 7101, *et seq.*; RCFC 12(b)(1); Subject-Matter Jurisdiction; Termination for Convenience; Sum Certain; Contracting Officer's Final Decision.

*Charles A. Weiss*, Counsel of Record, *Stephen R. Snodgrass*, Of Counsel, Bryan Cave Leighton Paisner LLP, St. Louis, MO, for plaintiff.

*Sonia W. Murphy*, Trial Attorney, *Deborah A. Bynum*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Joseph H. Hunt*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC; *Stephen T. O'Neal*, Of Counsel, General Services Administration, for defendant.

## **MEMORANDUM OPINION AND ORDER**

GRIGGSBY, Judge

## I.    **INTRODUCTION**

In this Contract Disputes Act ("CDA") matter, plaintiff, Creative Management Services, LLC, d/b/a MC² ("MC-2"), seeks a declaratory judgment against the government related to the General Services Administration's ("GSA") demand that MC-2 return certain reserve funds held in connection with a task order to provide marketing and logistical support services for annual government conferences and the settlement of MC-2's claim for certain termination for convenience costs related to work performed under that task order. *See generally* Compl. The government has moved to dismiss this action for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). *See*

*generally* Def. Mot.  For the reasons discussed below, the Court **GRANTS** the government's motion to dismiss and **DISMISSES** the complaint.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.    Factual Background

In this Contract Disputes Act action, MC-2 seeks a declaratory judgment related to the GSA's demand that MC-2 return certain reserve funds held by MC-2 in connection with a task order to provide marketing and logistical support services for annual government conferences. *See generally* Compl.  MC-2 also seeks a declaratory judgment related to its final termination for convenience settlement proposal in connection with the termination of that task order.  *Id.*

Specifically, in Counts I, II and III of the complaint, MC-2 seeks a declaratory judgment that:  (1) MC-2 is entitled to keep any funds representing the excess of revenue over expenses left at the end of certain GovEnergy conferences held during the period 2009 through 2011 (the "Reserve Funds"); (2) a GSA letter to MC-2 dated November 10, 2015, is not the contracting officer's final decision with regards to the government's demand for the payment of these Reserve Funds; and (3) a GSA letter to MC-2 dated January 31, 2018, regarding the Reserve Funds was sent more than six years after the government's claim to recover the Reserve Funds accrued.  *Id.* at ¶¶ 37-52.  Lastly, in Count IV of the complaint, MC-2 seeks a declaratory judgment that the GSA contracting officer's letter dated November 10, 2015, is a final decision only with respect to MC-2's termination for convenience settlement proposal and that the payment approved in that letter is due and owed to MC-2.  *Id.* at ¶¶ 53-55.

#### 1.    The MC-2 Task Order

On July 23, 2009, MC-2 was awarded task order GSA-00-09-AA-0203, which requires that MC-2 provide certain integrated marketing and logistical support services in connection with an annual conference for various federal agencies, known as the GovEnergy Conference and Trade Show (the "MC-2 Task Order").  Def. App'x at 1.

---

[1] The facts recited in this Memorandum Opinion and Order are taken from the complaint ("Compl."); the exhibits attached thereto ("Compl. Ex."); the government's motion to dismiss ("Def. Mot."); and the appendix attached thereto ("Def. App'x").  Unless otherwise noted, the facts recited herein are undisputed.

The MC-2 Task Order requires, among other things, that MC-2 "shall establish a separate bank account for all the revenue collected on behalf of the conference." *Id.* at 12. The MC-2 Task Order also requires that MC-2 "shall collect monies from attendee and exhibitor registration fees . . . [and] shall collect and account for such monies and hold them in trust for GovEnergy." *Id.* at 18. To that end, the MC-2 Task Order provides that:

> The monies collected shall comprise the "Reserve" for the conference event. With the GSA [Contracting Officer Technical Representative]'s *written authorization* upon review of a written monthly invoice, the [Contracting Officer Technical Representative] *may* direct [MC-2] to pay itself for services provided, as well as the other monthly expenses, from the respective conference event "Reserve".

*Id.* (emphasis original).

MC-2 successfully performed the MC-2 Task Order in 2009, 2010 and 2011. Def. Mot. at 2. But, the GSA terminated the MC-2 Task Order for convenience in 2012. Compl. at ¶ 7.

### 2.    The GSA's Request For The Reserve Funds

After the GSA terminated the MC-2 Task Order for convenience, MC-2 and the GSA engaged in negotiations to determine the costs that MC-2 would be entitled to recover due to the termination for convenience. *See* Compl. Ex. 1 at 5 ("no settlement agreement was reached by the parties . . . ."). In connection with those negotiations, the GSA sent an e-mail to MC-2 on July 18, 2012, which states that:

> The government requests that MC-2 return the entire Reserve Fund, under MC-2's management for GovEnergy under order GS-A-00-09-AA-0203, as well as an accounting of the amounts in the Reserve Fund over the life of the contract, no later than July 25, 2012. Based on our records the amount of the Reserve Fund is at least $1,230,127.05.

Def. App'x at 30.

On January 26, 2014, the GSA also sent a letter to MC-2 stating that "this is a second demand to MC-2 that all monies remaining in the account be returned to GSA." *Id.* at 35. This letter also states that "it is GSA's belief that the Reserve account under the control of MC-2 contained in excess of $1.3 million in 2012." *Id.*

On February 4, 2015, MC-2 responded to the GSA contracting officer's letter in an e-mail which states that MC-2 "immediately refunded all monies raised by MC-2 for this event as

was requested by GSA immediately following the cancelation [sic]" and that "any accounting related to previous years events that were successfully completed are not at issue now." *Id.* at 37.  On June 22, 2015, the GSA contracting officer responded to MC-2's February 4, 2015, e-mail and advised that the GSA had not received a final accounting of all revenue and expenses from MC-2 and the GSA requested that MC-2 return any excess monies in the Reserve Fund.  *Id.* at 41-42.

On August 31, 2015, MC-2 submitted a final termination for convenience settlement proposal to the GSA contracting officer seeking to recover $717,680.10.  Compl. Ex. 1 at 1.  MC-2 certified this claim on October 14, 2015.  *Id.*  At that time, MC-2 also submitted a letter to the GSA contracting officer stating that "there is no existing reserve fund and MC-2 is not holding any money that belongs to the Government."  Def. App'x at 45.

### 3. The November 10, 2015, Final Decision

On November 10, 2015, the GSA contracting officer issued a final decision (the "November 10, 2015, Final Decision") in which she considered each of MC-2's proposed termination for convenience costs and approved costs in the amount of $628,415.37.  Compl. Ex. 1 at 6-9.  But, the GSA contracting officer also determined that:

> MC-2 is not entitled to the $717,680.10 amount itemized . . . or any additional claimed amounts.  As previously communicated, it is GSA's belief that MC-2 is actually indebted to the Government, as it has kept, and not accounted for, GovEnergy monies in excess of its $717,680.10 certified claim.

*Id.* at 1.

In this regard, the GSA contracting officer determined that, based upon a July 11, 2012, e-mail from MC-2 to the GSA, there was "nearly $1.3 million—*i.e.*, $1,288,429.05" remaining in the Reserve Fund.  *Id.* at 2.  In addition, the GSA contracting officer observed that she had issued a demand in July 2012 to MC-2 for an accounting of the Reserve Fund and the return of any surplus monies in the fund.  *Id.* at 4.

The GSA contracting officer also observed that she issued a second demand "that all monies remaining in the account be returned to GSA" on January 26, 2014, and she stated that "[t]he Government again demands that MC-2 return all monies remaining in the [Reserve Fund]

4

account to GSA." *Id.* at 4, 10.  And so, the GSA contracting officer denied MC-2's claim.  *Id.* at 9.

### 4.   The January 31, 2018 Letter

On January 31, 2018, the GSA contracting officer sent another letter to MC-2 requesting a "payment in the amount of $660,013.68 and applicable interest on this amount from July 18, 2012."  Compl. Ex. 2 at 1.  This letter provides that:

> On November 10, 2015, pursuant to the Contract Disputes Act of 1978 . . ., GSA issued a Contracting Officer's Final Decision to [MC-2] and determined that MC-2 failed to account for, and improperly retained, $1,288,429.05 that was held in trust for the Government.

*Id.*  The January 31, 2018 letter also provides that:

> MC-2 received the Final Decision on November 12, 2015 through its counsel . . . and MC-2 did not appeal.  By virtue of MC-2's election not to appeal the Final Decision under the processes established by the CDA, this debt is final and conclusive.

*Id.*

MC-2 commenced this CDA action on December 6, 2018.  *See generally* Compl.

### B.   Procedural History

MC-2 filed the complaint in this matter on December 6, 2018.  *See generally id.*  On June 14, 2019, the government filed a motion to dismiss this matter for lack of subject-matter jurisdiction, pursuant to RCFC 12(b)(1).  *See generally* Def. Mot.

On July 12, 2019, MC-2 filed a response and opposition to the government's motion to dismiss.  *See generally* Pl. Resp.  On July 26, 2019, the government filed a reply in support of its motion to dismiss.  *See generally* Def. Reply.

The government's motion to dismiss having been fully briefed, the Court resolves the pending motion.

## III. LEGAL STANDARDS

### A. RCFC 12(b)(1)

When deciding a motion to dismiss upon the ground that the Court does not possess subject-matter jurisdiction pursuant to RCFC 12(b)(1), this Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); RCFC 12(b)(1). But, plaintiff bears the burden of establishing subject-matter jurisdiction, and it must do so by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). Should the Court determine that "it lacks jurisdiction over the subject matter, it must dismiss the claim." *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006).

In this regard, the United States Court of Federal Claims is a court of limited jurisdiction and "possess[es] only that power authorized by Constitution and statute. . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The Tucker Act grants the Court jurisdiction over:

> [A]ny claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act is, however, a jurisdictional statute; "it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976) (alterations original). And so, to pursue a substantive right against the United States under the Tucker Act, a plaintiff must identify and plead a money-mandating constitutional provision, statute, or regulation; an express or implied contract with the United States; or an illegal exaction of money by the United States. *Cabral v. United States*, 317 F. App'x 979, 981 (Fed. Cir. 2008) (citing *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005)); *see also Martinez v. United States*, 333 F.3d 1295, 1302 (Fed. Cir. 2003). "[A] statute or regulation is money-mandating for jurisdictional purposes if it 'can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s].'" *Fisher*, 402 F.3d at 1173 (quoting *United States v. Mitchell*, 463 U.S. 206, 217 (1983)).

## B. The Contract Disputes Act

The Tucker Act provides that this Court "shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [the Contract Disputes Act], . . . on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2); *see also Renda Marine, Inc. v. United States*, 71 Fed. Cl. 378, 386 (2006). And so, to establish jurisdiction in a Contract Disputes Act ("CDA") matter, a plaintiff must demonstrate compliance with the requirements of the CDA.

In this regard, the CDA requires that all claims made by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a final decision. 41 U.S.C. § 7103(a); *Northrop Grumman Computing Sys., Inc. v. United States*, 709 F.3d 1107, 1111-12 (Fed. Cir. 2013) ("A prerequisite for jurisdiction of the Court of Federal Claims over a CDA claim is a *final decision* by a contracting officer on a *valid claim*.") (emphasis original); *see also Securiforce Int'l Am., LLC v. United States*, 879 F.3d 1354, 1359 (Fed. Cir. 2018). If the claim made by the contractor is for more than $100,000, the contractor must also certify the claim. 41 U.S.C. § 7103(b)(1). And so, the contractor's claim submission and the requirement that the contracting officer render a final decision on the claim are mandatory and jurisdictional prerequisites before a contractor may file suit in this Court. *See M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1328 (Fed. Cir. 2010) (stating that "for the Court of Federal Claims to have jurisdiction under the CDA, the contractor must submit a proper claim—a written demand that includes (1) adequate notice of the basis and amount of a claim and (2) a request for a final decision") (citing *James M. Ellett Constr. Co., v. United States*, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996)).

The CDA also addresses government claims against a contractor. In this regard, the CDA provides that "[e]ach claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision by the contracting officer." 41 U.S.C. § 7103(a)(3). In addition, the CDA generally requires that claims by a contractor or the government relating to a contract "shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A).

While the CDA does not define the term "claim," the FAR defines a "claim" as follows:

> [A] written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or related to the contract.

48 C.F.R. § 2.101.  A CDA claim need not follow a set form, but, the claim must provide the contracting officer with adequate notice of the basis for, and amount of, any claim.  *M. Maropakis Carpentry*, 609 F.3d at 1328; *see also Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987) (stating that the claim must contain "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim").  Given this, the Federal Circuit has recognized that "a sum certain naturally must be asserted.  It is, after all the defining measure of that right."  *J.P. Donovan Constr. v. Mabus*, 469 F. App'x 903, 906 (Fed. Cir. 2012) (quoting *Essex Electro Engineers, Inc. v. United States*, 960 F.2d 1576, 1581 (Fed. Cir. 1992)).

With regards to what is meant by a "sum certain," this Court has held that the CDA's "sum certain requirement is met if the contracting officer can determine the amount claimed by a simple mathematical calculation."  *Modeer v. United States*, 68 Fed. Cl. 131, 137 (2005); *see also CPS Mech. Contractors v. United States*, 59 Fed. Cl. 760, 764 (2004).  The Federal Circuit has held, however, that a CDA claim that uses qualifying language does not state a sum certain.  *J.P. Donovan Constr.*, 469 F. App'x at 908.  And so, dismissal of such a claim for lack of subject-matter jurisdiction is appropriate.  *Id*.

The CDA also contains a statute of limitations, which requires that a contractor must file a direct action disputing a contracting officer's final decision in this Court within 12 months of receiving the final decision.  41 U.S.C. § 7104(b)(3).  And so, a claim brought more than 12 months after receiving a contracting officer's final decision is untimely and must be dismissed for lack of subject-matter jurisdiction.  *RMA Eng'r S.A.R.L. v. United States*, 140 Fed. Cl. 191, 216-17 (2018).

**IV.   LEGAL ANALYSIS**

The government has moved to dismiss this matter for lack of subject-matter jurisdiction, upon the ground that MC-2's Contract Disputes Act claims are untimely, because MC-2 filed this action more than 12 months after receiving the GSA contracting officer's November 10, 2015, Final Decision.  Def. Mot. at 8-12.  MC-2 counters in its response and opposition to the

8

government's motion to dismiss that the Court may consider its claims related to the government's demand that MC-2 return the Reserve Funds, because MC-2 commenced this action within 12 months of receiving the final decision on this claim. Pl. Resp. at 5-6. And so, MC-2 requests that the Court deny the government's motion to dismiss. *Id.* at 6.

For the reasons set forth below, a careful review of the factual record in this matter shows that all of MC-2's CDA claims are untimely. And so, the Court **GRANTS** the government's motion to dismiss and **DISMISSES** the complaint.

### A. The Court May Not Consider MC-2's Termination For Convenience Claim

As an initial matter, there is no genuine dispute that MC-2's CDA claim related to its termination for convenience settlement proposal is untimely. The CDA requires that MC-2 file this CDA action within 12 months of receiving the GSA contracting officer's final decision on its termination for convenience claim. 41 U.S.C. § 7104(b)(3). And so, if MC-2 failed to file this claim within 12 months of receiving the GSA contracting officer's final decision, the Court must dismiss the claim for lack of subject-matter jurisdiction. *RMA Eng'r S.A.R.L. v. United States*, 140 Fed. Cl. 191, 216-17 (2018).

It is undisputed that the GSA contracting officer issued a final decision on MC-2's termination for convenience claim on November 10, 2015, and that MC-2 received this final decision on November 12, 2015. Def. Mot. at 11; Pl. Resp. at 2; Compl. Ex. 1 at 1 (stating that "MC-2 received the Final Decision on November 12, 2015 . . . ."). And so, to be timely, MC-2 must have filed its termination for convenience claim by November 12, 2016. 41 U.S.C. § 7104(b)(3). MC-2 commenced this action on December 6, 2018—long after the CDA's 12-month statute of limitations period expired. *See generally* Compl. And so, as both parties appear to agree, the Court must dismiss this claim for lack of subject-matter jurisdiction. Def. Mot. at 10-11; Pl. Resp. at 2; *see also RMA Eng'r*, 140 Fed. Cl. at 216-17; RCFC 12(b)(1).

### B. The Court May Not Consider MC-2's Reserve Funds Claims

While a somewhat closer question, the factual record for this matter also shows that the Court may not consider MC-2's CDA claims related to the GSA's demand for the return of the Reserve Funds, because these claims are also untimely.

To resolve the government's motion to dismiss the Reserve Fund claims, the Court considers three crucial questions. First, whether the GSA issued a valid claim under the CDA for the return of the Reserve Funds. Second, if so, whether the GSA's CDA claim was the subject of a written decision by the GSA contracting officer. And finally, whether MC-2 failed to commence this action within 12 months of receiving the GSA contracting officer's final decision on the government's CDA claim. Because the factual record makes clear that the Court must answer each one of these questions in the affirmative, the Court dismisses these claims.

With regards to the first question, the factual record before the Court makes clear that the GSA issued a valid CDA claim demanding that MC-2 return the Reserve Funds held in connection with the MC-2 Task Order. The FAR defines a claim as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101. In this case, the evidence shows that the GSA issued a written demand to MC-2 for the return of the Reserve Funds on two separate occasions, consistent with the CDA.

First, it is undisputed that the GSA contracting officer sent an e-mail to MC-2 on July 18, 2012, stating, in relevant part that:

> *The government requests that MC-2 return the entire Reserve Fund, under MC-2's management for GovEnergy* . . . as well as an accounting of the amounts in the Reserve Fund over the life of the contract, no later than July 25, 2012. Based on our records the amount of the Reserve Fund is at least $1,230,127.05.

Def. App'x at 30 (emphasis supplied). Thereafter, the GSA contracting officer sent a letter to MC-2 on January 26, 2014, which states, among other things, that "this is a second demand to MC-2 that all monies remaining in the [Reserve] account be returned to GSA." *Id.* at 35. The aforementioned email and letter clearly notify MC-2 that the GSA is seeking the return of all of the Reserve Funds for the MC-2 Task Order. *Id.* at 30, 35. Given this, the Court agrees with the government that the GSA issued a written demand to MC-2 seeking the payment of money, as contemplated by the CDA.

The evidence before the Court also shows that the GSA's written demands for payment of the Reserve Funds sought "the payment of money in a sum certain," as required by the CDA.

48 C.F.R. § 2.101.  In his July 18, 2012, email to MC-2, the GSA contracting officer states that "[b]ased on our records the amount of the Reserve Fund is at least $1,230,127.05."  Def. App'x at 30.  The GSA contracting officer's January 26, 2014, letter similarly describes the amount of the Reserve Funds sought by the government to be "in excess of $1.3 million in 2012," based upon accounting documentation showing the activity in the Reserve account during the period 2009-2012.  *Id.* at 35.

MC-2 correctly observes that the GSA contracting officer's e-mail and letter do not state the exact dollar amount of the Reserve Funds demanded by the government.  Pl. Resp. at 3-5.  But, the Court is not persuaded by MC-2's argument that these written demands are deficient because they fail to request a sum certain.  *Id.* at 2-6.

This Court has recognized that the CDA's sum certain requirement may be met if the amount claimed can be determined by a simple mathematical calculation.  *Modeer v. United States*, 68 Fed. Cl 131, 137 (2005); *see also CPS Mech. Contractors v. United States*, 59 Fed. Cl. 760, 764 (2004).  In this case, the GSA contracting officer makes abundantly clear in her email and letter to MC-2 that the government is demanding the return of "*the entire Reserve Fund*" and "*all monies*" contained in the Reserve Fund.  Def. App'x at 30, 35.  The MC-2 Task Order also makes clear that the Reserve Funds demanded by the government are held in "a separate bank account for all the revenue collected on behalf of the conference."  *Id.* at 12.  Given this, the Court reads the GSA contracting officer's written demands to state that the government was demanding the return of all funds contained in the Reserve Fund account.

Because there is no genuine dispute that MC-2 could have readily calculated the precise amount of the funds contained in the Reserve Fund by obtaining the current balance for the Reserve Fund account, the Court reads the GSA contracting officer's written demands to state a sum certain and to adequately notify MC-2 of the basis of the GSA's claim.  *See* Pl. Resp. at 3 ("MC-2 has this money in its possession . . . .").  And so, the Court concludes that the GSA has issued a valid CDA claim for the return of the Reserve Funds.

Lastly, the factual record makes clear that the government's CDA claim demanding the return of the Reserve Funds was also the subject of the GSA contracting officer's November 10, 2015, Final Decision.  41 U.S.C. § 7103(a)(3) (requiring that "[e]ach claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision

11

by the contracting officer"). Indeed, a careful review of the November 10, 2015, Final Decision shows that the GSA contracting officer addressed and analyzed the government's demand that MC-2 return the Reserve Funds. Notably, at the outset of the November 10, 2015, Final Decision, the GSA contracting officer states that "it is GSA's belief that MC-2 is actually indebted to the Government, as it has kept, and not accounted for, GovEnergy monies in excess of [MC-2's] $717,680.10 certified claim." Compl. Ex. 1 at 1. The November 10, 2015, Final Decision, also refers to the pertinent contractual requirements of the MC-2 Task Order with regards to the Reserve Funds. *Id.* at 2 (stating that "Section 2.4.2 of the task order, Conference Financial Management, required MC-2 to 'establish a separate bank account for all the revenue collected on behalf of the conference as a result of registration, exhibit sales and sponsorship sales'").

The GSA contracting officer also observes in the November 10, 2015, Final Decision that she "had issued a demand in July 2012 to MC-2 for an accounting of the Reserve Fund and a return of any surplus monies in the Fund." *Id.* at 4. In addition, the GSA contracting officer states that "[o]n January 26, 2014, [she] issued a second demand 'to MC-2 that all monies remaining in the account be returned to GSA.'" *Id.*

The GSA contracting officer also determined in the November 10, 2015, Final Decision that she must deny MC-2's claim for termination for convenience costs, because the proposed settlement amount "*is significantly less than the monies believed held by MC-2 in the Reserve Fund.*" *Id.* at 9 (emphasis supplied). Given this, there can be no genuine dispute that the government's CDA claim demanding the return of the Reserve Funds was the subject of the contracting officer's November 10, 2015, Final Decision.[2]

---

[2] MC-2's argument that a subsequent letter from the GSA contracting officer, dated January 31, 2018, is the contracting officer's final decision on the government's CDA claim is also misguided. The GSA contracting officer's January 31, 2018, letter contains none of the elements required to be a final decision. 48 C.F.R. § 33.211(a)(4) (stating that a final decision must include a description of the claim or dispute, a reference to the pertinent contract terms, a statement of the factual areas of agreement and disagreement, a statement of the contracting officer's decision, with supporting rationale, and a paragraph); *see also* Compl. Ex. 2. In fact, this letter expressly states that the GSA contracting officer's November 10, 2015, Final Decision is the final decision on the government's CDA claim. Compl. Ex. 2 at 1 ("On November 10, 2015, pursuant to the [CDA], GSA issued a Contracting Officer's Final Decision . . .").

Because the Court concludes that the GSA contracting officer issued a final decision on the government's CDA claim demanding the return of the Reserve Funds on November 10, 2015, the Court must also conclude that MC-2's Reserve Fund claims—which have been filed more than 12 months after MC-2 received the GSA contracting officer's final decision—are untimely.  41 U.S.C. § 7104(b)(3).  And so, the Court dismisses these claims for lack of subject-matter jurisdiction.  RCFC 12(b)(1).

## V. CONCLUSION

In sum, all of MC-2's claims in this Contract Disputes Act matter are untimely because MC-2 commenced this action more than 12 months after receiving the GSA contracting officer's November 10, 2015, Final Decision on these claims.  And so, for the foregoing reasons, the Court:

1. **GRANTS** the government's motion to dismiss; and
2. **DISMISSES** the complaint.

The Clerk shall enter judgment accordingly.

Each party shall bear their own costs.

**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge